#27204-a-LSW

**2015 S.D. 61**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

LISA M. DAVIS,                                   Plaintiff and Appellant,

    v.

WHARF RESOURCES (USA), INC.,
a wholly owned subsidiary of
GOLDCORP, INC.,                             Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE RANDALL L. MACY
Judge

\* \* \* \*

HEATHER M. LAMMERS BOGARD
CHRISTOPHER A. CHRISTIANSON of
Costello, Porter, Hill, Heisterkamp,
  Bushnell & Carpenter, LLP
Rapid City, South Dakota                    Attorneys for plaintiff
                                 and appellant.


DANETA WOLLMANN of
Banks, Johnson, Kappelman
  & Becker, PLLC
Rapid City, South Dakota                    Attorneys for defendant
                                 and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MARCH 23, 2015

OPINION FILED **07/15/15**

#27204

WILBUR, Justice

[¶1.]     Wharf Resources, Inc. (Wharf), a wholly owned subsidiary of Goldcorp, Inc., terminated Lisa Davis for "disruptive behavior in the workplace." Davis filed two claims of gender discrimination and retaliatory discharge with the South Dakota Department of Labor, Division of Human Rights (Department). The circuit court affirmed the Department's finding of no probable cause. We affirm.

**Background**

[¶2.]     Wharf, a mining company, employed Davis until she was terminated on May 21, 2013.[1] Davis received good performance evaluations during her tenure at Wharf. She was promoted to leader of her crew and was asked to lead her crew in the Wellness Program, serve in the Emergency Response Team, and attend the Leadership Development Program. At her five-year employment anniversary, she was commended in front of her crew and acknowledged as a "great crew leader." Both Davis and Wharf agree that with the exception of one "minor" write up, Davis worked without incident until May 7, 2013.

[¶3.]     Wharf employed Davis as a truck driver. Sometime in the beginning of 2010, Davis was asked to learn how to perform the Plant Operator II (Operator II) position. She subsequently learned and temporarily performed the Operator II position. When a permanent position became available several months later, she applied. In July of 2010, Dave Emery, the Process General Foreman, hired Bill Swenson for the position. This decision upset Davis because she thought she

---

1.     Davis began her employment with Wharf in 1994. She left Wharf in 2001 and returned in 2007.

-1-

deserved the position instead of Swenson. Soon after Swenson was hired, Davis learned from other employees that several years ago, Emery made negative remarks about women not belonging in mining. Davis talked to Ron Everett, the Administrative Department Head, about feeling uncomfortable with Emery's comments. Wharf investigated the matter and concluded that Emery was joking when he made the comments.

[¶4.] Wharf included an "Open-Door Policy" in its employee handbook that allowed employees to meet with upper-management and discuss certain problems and concerns:

> Problems and concerns can often be effectively resolved by communication. The open-door policy at Wharf Resources allows employees the opportunity to discuss ideas, policies, procedures, working relationships, and other concerns with any member of Company management. If you need assistance to resolve a problem, you are encouraged to discuss it with your immediate supervisor first. If the problem is not satisfactorily resolved or if you feel you cannot discuss the matter with your supervisor, you may address the issue with the manager of your department, human resources staff, or with the general manager.

The purpose section of the policy provided, "There will be no retribution whatsoever for an employee invoking this policy. The best way to solve issues between people is through *positive open discussion*. I feel confident this policy is understood and accepted by all of our employees. . . . Please use it at your discretion." (Emphasis added.)

[¶5.] Davis utilized the open-door policy and scheduled a meeting with Mine General Manager, Mike McClelland, on May 7, 2013. The original purpose of the meeting was to discuss a project that McClelland needed to approve before Davis

could present it at a class. However, when the meeting started, Davis told McClelland that she needed to discuss some personnel issues and invited him to have someone from human resources in the meeting. McClelland asked Ken Nelson, the Operations Manager, to participate in that part of the meeting because Ron Everett and Human Resources Generalist Meg Manke were unavailable. Davis became flustered and nervous because, in her view, Nelson was part of the problem; but she ultimately agreed to the presence of Nelson at the meeting.

[¶6.]    At the May 7th meeting, Davis informed McClelland and Nelson about past improprieties involving the management at Wharf and current low morale among an unhappy, disgruntled workforce. She stated that the "new" work schedule was a large part of employee dissatisfaction. She further expressed dissatisfaction with the hiring of a male employee, Swenson, for the Operator II position instead of her. She explained that Bobbie Isaak, a female employee at Wharf, had applied for a similar position that was also assumed by a male employee. Davis spent most of the meeting discussing her frustration that her husband, Bruce Davis, an employee of Wharf, was placed on a performance improvement plan by Emery—his supervisor. Davis further stated that Bruce should have received the Process General Foreman position instead of Emery.

[¶7.]    On May 14, 2013, Davis met with Meg Manke in a follow-up, audio-recorded meeting. Davis elaborated on the problems and concerns she had expressed at the May 7th meeting. At the beginning of this meeting, Davis reiterated that Emery was a bully, a liar, and a sociopath, and that he had no integrity, morals, or ethics. Davis admitted she was emotional at the prior meeting

and that "[i]t took [her] two days to get over her hysteria last week." She conceded, "I don't want to be in the center of this because my husband is involved and I am an emotional wife because of this. And, I admit that I am."

[¶8.] Wharf terminated Davis for "disruptive behavior in the workplace" on May 21, 2013. Several months later on August 15, 2013, Davis filed a gender discrimination claim and a retaliatory discharge claim with the Department alleging Wharf violated SDCL 20-13-10 of the South Dakota Human Relations Act and Title VII of the Civil Rights Act of 1964.[2] Davis submitted a detailed narrative describing the basis for her gender discrimination and retaliatory discharge claims. She stated in part, "I believe that I was fired for following the company's open door policy and whistle blower policy because I brought my concerns about myself and Bobbie Isaak being passed over and for bringing to the company's attention that I believe the same man that passed her and I over is bullying and harassing the people in his department."

---

2.      The record reflects that Davis did not advance a failure to promote claim as part of her gender discrimination claim with the Department—i.e., that Wharf discriminated against her by hiring Swenson, instead of her, for the Operator II position. Her formal charge of discrimination listed only one basis of individual harm: "I was discharged." While she has made references in her briefs and filings in this matter about Wharf's failure to promote her to the Operator II position, the Department of Labor did not consider her failure to promote claim, and she did not raise the issue before the circuit court. Moreover, the failure to promote claim, which originated in July of 2010, was likely time barred by SDCL 20-13-31 when she filed her discrimination claim on August 15, 2013. SDCL 20-13-31 provides, "Any charge [of discrimination] filed under this chapter shall be filed within *one hundred and eighty days* after the alleged discriminatory or unfair practice occurred." (Emphasis added.)

[¶9.] On September 7, 2013, Wharf submitted a written position statement addressing Davis's termination. Wharf stated that at the May 7, 2013 meeting, "Davis was overtly hostile, aggressive, and disrespectful." She used "vulgar language" and made "allegations regarding corruption and mismanagement of the Wharf mine." She "repeatedly made disrespectful comments toward employees in supervisory or managerial positions." Specifically, Davis "expressed anger that her husband should have been given the position of General Process Foreman, instead of Dave Emery." She made "derogatory and disparaging comments about" Emery and stated that he was "sexist." Consequently, Wharf concluded that although it "has an open door policy that welcomes constructive criticism and recommendations," Davis's behavior during the May 7th meeting exceeded "any reasonable use" of the policy. Moreover, before and after the May 7, 2013 meeting, Davis "went to various other Wharf Resources employees expressing her dissatisfaction with . . . Emery in an attempt to raise support for her belief that [he] should be fired." Thus, Wharf stated that it terminated Davis "due to her disrespectful and unprofessional conduct which caused disruption in the workplace."

[¶10.] The Department mailed Davis a copy of Wharf's position statement on September 18, 2013, instructing her to reply to the statement and identify those facts which were in dispute and provide evidence to support her position. The Department expressly told Davis that a "failure to dispute any of [Wharf's] facts will indicate that you agree with those facts." She was asked to respond by October 2, 2013. The deadline was extended to October 9, 2013, after she requested an

extension. Ultimately, Davis did not dispute Wharf's rendition of the facts or the reason for her termination.

[¶11.] The Department issued findings of fact, conclusions of law, and a memorandum decision on December 11, 2013. The Department determined that there was no probable cause for Davis's claims. The Department noted that Davis "did not provide a response disputing [Wharf's] reasons for her discharge." The circuit court affirmed the Department's finding of no probable cause. Davis appeals and raises the following issues for our review:

1. Whether the circuit court erred by affirming the Department's finding of no probable cause.

2. Whether the circuit court erred when it determined that Davis was terminated for permissible factors.

3. Whether the circuit court erred by affirming the findings of fact and conclusions of law submitted by the Department.

**Standard of Review**

[¶12.] "On an appeal from an administrative agency decision, this Court reviews the agency findings in the same manner required of the circuit court." *Associated Sch. Bds. of S.D., Inc. v. Hughes Cnty.*, 2002 S.D. 41, ¶ 8, 643 N.W.2d 417, 419. "When the record before the agency consists entirely of documentary evidence, our review is de novo." *Williams v. S.D. Dep't of Agric.*, 2010 S.D. 19, ¶ 5, 779 N.W.2d 397, 400. Here, the record before us consists entirely of documentary evidence; therefore, our review is de novo.

**Analysis**

[¶13.] **1. Whether the circuit court erred by affirming the Department's finding of no probable cause.**

[¶14.]     Davis brought two claims before the Department under SDCL 20-13-10.  First, Davis claimed that she was the victim of sexual discrimination because she was terminated on the basis of her gender.  Second, she claimed that Wharf retaliated against her for reporting discriminatory conduct in the workplace.  Under SDCL chapter 20-13, the Department has a duty to investigate Davis's claims to determine if there is probable cause to support Davis's allegations.  *See* SDCL 20-13-1.1, -28.1, -32.  "Probable cause" means "a determination that it is more likely than not that the charging party and members of a class, or both, were discriminated against based on a violation of this chapter."  SDCL 20-13-1.1.  Further, it is "[t]he charging party [that] bears the burden of proving by a preponderance of the evidence the allegations in his charge."  SDCL 20-13-37.

[¶15.]     The determination and burden under South Dakota law is consistent with the standard applied by the United States Supreme Court.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981) (stating that a disparate-treatment plaintiff has the "ultimate burden of persuading the court that she has been the victim of intentional discrimination").  The Eighth Circuit Court of Appeals has also explained that a plaintiff can meet her burden by "present[ing] 'direct evidence of discrimination, that is, evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" *McGinnis v. Union Pac. R.R.*, 496 F.3d. 868, 873 (8th Cir. 2007) (quoting *Russell v. City of Kan. City, Mo.*, 414 F.3d 863, 866 (8th Cir. 2005)).  *See also Burdine*, 450

U.S. at 256, 101 S. Ct. at 1095 ("[The plaintiff] may succeed in [proving intentional discrimination] directly by persuading the court that a discriminatory reason more likely motivated the employer . . . .").

[¶16.]		The Supreme Court acknowledged, however, that "the question facing triers of fact in discrimination cases is both sensitive and difficult." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S. Ct. 1478, 1482, 75 L. Ed. 2d 403 (1983). "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *Id.* Because "direct evidence" of discrimination is seldom available to plaintiffs in discrimination cases, the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), developed a three-part burden shifting analysis "to bring the litigants and the court expeditiously and fairly to th[e] ultimate question" of whether the plaintiff "has been the victim of intentional discrimination."[3] *Burdine*, 450 U.S. at 253-56 101 S.

---

3.		"The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the 'plaintiff [has] his day in court despite the unavailability of direct evidence.'" *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S. Ct. 613, 622, 83 L. Ed. 2d 523 (1985) (alteration in original) (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979)) ("The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."). The burden shifting analysis is characterized as "merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 2949, 57 L. Ed. 2d 957 (1978). As such, "[t]he *McDonnell Douglas* methodology was 'never intended to be rigid, mechanized, or ritualistic.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519, 113 S. Ct. 2742, 2753, 125 L. Ed. 2d 407 (1993) (quoting *Aikens*, 460 U.S. at 715, 103 S. Ct. at 1482). Instead, *McDonnell Douglas* merely "established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000) (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 506, 113 S. Ct. at 2746).

(continued . . .)

Ct. at 1094-95. The *McDonnell Douglas* burden shifting framework is reflected in our State's statute: "The likelihood that discrimination occurred is assessed based upon evidence that establishes a prima facie case, and if the respondent has provided a viable defense, whether there is evidence of pretext." SDCL 20-13-1.1.

[¶17.]     Pursuant to SDCL 20-13-1.1, SDCL 20-13-37, and the *McDonnell Douglas* analysis, the complainant carries the initial burden of establishing a prima facie claim by the preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Lord v. Hy-Vee Food Stores*, 2006 S.D. 70, ¶ 18, 720 N.W.2d 443, 449-50. If the complainant succeeds in establishing a prima facie case, the burden then shifts to the "employer to articulate a legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824. Finally, if the employer carries this burden, the burden shifts back to the complainant to establish "that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1094 (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S. Ct. at 1825).

---

(. . . continued)

Furthermore, "although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S. Ct. at 2747 (quoting *Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093). While the combination of proof of pretext and a prima facie case *may* be sufficient to sustain a plaintiff's burden, *Reeves*, 530 U.S. at 149, 120 S. Ct. at 2109, it is not *necessarily* sufficient, *St. Mary's Honor Ctr.*, 509 U.S. at 519, 113 S. Ct. at 2754 ("It is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.").

## A. Gender Discrimination

[¶18.] The circuit court affirmed the Department's determination that Davis failed to establish a prima facie case of gender-based discrimination. In order to prevail on a gender-based wrongful discharge claim, Davis must first establish a prima facie case by proving that "(1) she was a member of the protected group; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination." *Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831 (8th Cir. 2008). *See also McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824.

[¶19.] Here, the first element of the discrimination claim is satisfied because Davis, as a female, is a member of a protected class. *See Rebouche v. Deere & Co.*, 786 F.3d 1083, 1087 (8th Cir. 2015). Next Davis must establish that she was qualified to perform her job. *Id.* The Department stated that the standard for this element is whether Davis "was qualified for her job (i.e. was performing job *satisfactorily*)[.]" (Emphasis added.) The Department found that Davis did not perform her job satisfactorily. Davis argues, however, that the circuit court incorrectly applied the law by equating whether Davis was qualified for her job with whether she satisfactorily performed her job. The correct standard, Davis argues, is whether she was objectively qualified to perform her job.

[¶20.] Some courts have applied a "reasonable expectation" standard for the second element of the prima facie case, which is the standard the Department utilized, requiring the plaintiff to prove that she satisfactorily performed her job. *See Mudrich v. Wal-Mart Stores, Inc.*, 955 F. Supp. 2d 1001, 1008 (D. Minn. 2013);

*Jelsma v. City of Sioux Falls*, 744 F. Supp. 2d 997, 1013 (D.S.D. 2010); *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002); *Schwager v. Sun Oil Co. of Pa.*, 591 F.2d 58 (10th Cir. 1979). Other courts, notably the Eighth Circuit, have applied an "objectively qualified" standard. *See Haigh v. Gelita USA, Inc.*, 632 F.3d 464, 469-70 (8th Cir. 2011); *Hothem v. Schneider*, 865 F. Supp. 2d 962, 975-76 (D.S.D. 2012). Under the "objectively qualified" standard, a "'plaintiff must show only that [she] possesses the basic skills necessary for performance of the job,' not that [she] was doing it satisfactorily." *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 874 n.2 (8th Cir. 2007) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)).

[¶21.]     We are persuaded to adopt the "objectively qualified" standard utilized by the Eighth Circuit Court of Appeals. *See Haigh*, 632 F.3d at 469-70. We agree with the Eighth Circuit's reasoning that this standard "is more sound under the burden-shifting framework because the plaintiff should not be tasked with anticipating and disproving [her] employer's reasons for termination during his prima facie case." *Id.* at 470. Essentially, the reasonable expectations standard would require Davis to "disprove the reasons given for [her] discharge rather than requiring [her] to establish a prima facie case—short-circuiting the analysis under the *McDonnell Douglas* framework." *McGinnis*, 496 F.3d at 875 n.3. Wharf concedes that Davis was objectively qualified to perform her job. Therefore, Davis has satisfied her burden of establishing this element.

[¶22.]     The third element, whether Davis suffered an adverse employment action, is also satisfied because it is undisputed that Davis was discharged from her

employment. *See Bearden*, 529 F.3d at 831. The final element is whether the "circumstances permit an inference of discrimination." *Id.*; *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011); *Lewis v. Heartland Inns of Am., LLC*, 591 F.3d 1033, 1038 (8th Cir. 2010). The circuit court identified the fourth element as requiring Davis to prove "that after her discharge the position remained open (or the position was filled by someone not of her protected class)." *Contra Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006). Given our de novo review of the law in this case, we have authority to modify the decision of the Department and the circuit court and incorporate the correct prima facie elements of the wrongful discharge claim into the findings of fact and conclusions of law. *Snelling v. S.D. Dep't of Soc. Servs.*, 2010 S.D. 24, ¶ 13, 780 N.W.2d 472, 478 ("We examine de novo all questions of law, as well as documentary evidence contained in the record."); *Seymour v. W. Dakota Vocational Technical Inst.*, 419 N.W.2d 206, 209 (S.D. 1988) ("Although the trial court may have upheld the Board's decision for the wrong reason, we will not overturn a right result even though it is based on a wrong reason.").

[¶23.] An inference of discrimination arises when the plaintiff shows "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under [Title VII].'" *Furnco*, 438 U.S. at 576, 98 S. Ct. at 2949 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358, 97 S. Ct. 1843, 1866, 52 L. Ed. 2d 396 (1977)). One common way a plaintiff may establish an inference of discrimination "is to prove disparate treatment 'by showing

that [plaintiff] was treated less favorably than similarly situated employees who are not in plaintiff's protected class.'" *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 687 (8th Cir. 1998) (alteration in original) (quoting *Johnson v. Legal Servs. of Ark., Inc.*, 813 F.2d 893, 896 (8th Cir. 1987)).

[¶24.]     Davis has not satisfied her burden of demonstrating an inference of discrimination.  Davis argues that this element is "unquestionably" met because "[s]he has repeatedly shown that she was treated differently than her male cohorts and/or was subject to biased comments by a decision-maker."  First, Davis argues that she was treated differently than similarly situated males.  *See Wierman*, 638 F.3d at 994; *Wells*, 469 F.3d at 701.  As proof, Davis asserts that Wharf replaced her with a male employee after she was terminated and, in addition, Wharf hired Swenson—a male employee—for the Operator II position instead of her.  However, mere evidence that Wharf hired a male either for the Operator II position, or to replace her when she was terminated does not, by itself, warrant an inference of discrimination.  *See Wells*, 469 F.3d at 702 (acknowledging that a plaintiff does not satisfy her burden of demonstrating an inference of discrimination merely by presenting evidence that her position was subsequently assumed by a male).  Here, Davis points out that after she was terminated, Wharf hired a male employee for her position.  She does not advance any argument to suggest that this amounts to an inference of discrimination other than the simple fact that a male employee ultimately replaced her.  Similarly, the mere fact that Wharf hired a male employee for the Operator II position also does not lead to an inference of discrimination.  In fact, the record indicates that Swenson was selected for the job because he had

previously worked as a plant operator in Nevada and was the more qualified candidate for the position.

[¶25.] Davis argues, however, that "the fact that a male replaced [her] can be considered as a piece of the evidence under the fourth element." She contends that an inference of discrimination is bolstered by the fact that Emery made discriminatory comments about women not belonging in mining. Davis has not shown that these comments have any relation to Wharf's decisional process in discharging her. *See id.* (stating that certain sexist comments "are immaterial because they were . . . unrelated to the decisional process itself"). The comments were not made to Davis nor did she hear Emery make the comments. The comments were made several years before Davis was discharged. Wharf investigated the matter and concluded that Emery was not serious when he made the comments. This evidence is too speculative and remote to establish an inference of discrimination. *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.4d 55, 62 (4th Cir. 1995) (holding that evidence was "too remote and too tenuous to create a genuine issue of material fact").

[¶26.] Finally, Davis alleges that on May 14, 2013, in the follow-up meeting to the May 7, 2013 meeting, Manke asked her if her actions leading up to her discharge were because she was an "emotional wife." The audio recording of the May 14, 2013 meeting does not reflect that Manke asked Davis this question. Instead, the audio recording indicates that Davis volunteered, "I did get emotional at my meeting with [McClelland] and [Nelson] because, yes, my husband is involved in this and that's an emotional thing for me." She then volunteered, "I don't want to

be in the center of this because my husband is involved and I am an emotional wife because of this. And, I admit that I am." Even assuming that Manke asked Davis if she was an "emotional wife,"[4] Davis has not set forth "actions taken by [Wharf] from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on [unlawful gender discrimination].'" *See Furnco*, 438 U.S. at 576, 98 S. Ct. at 2949 (quoting *Int'l Bhd. Of Teamsters*, 431 U.S. at 358, 97 S. Ct. at 1866). Because Davis did not satisfy her burden of proving a prima facie case of gender discrimination, the circuit court did not err by affirming the Department's finding of no probable cause. *See Bearden*, 529 F.3d at 831. Having determined that Davis did not present a prima facie case of gender discrimination, we need not determine whether Wharf proffered a "legitimate, nondiscriminatory reason" for Davis's discharge. *See Wells*, 469 F.3d at 702. *See also McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824. But even if Davis had satisfied her burden of establishing a prima facie case, there is sufficient evidence in the record to find that Wharf satisfied its burden of proffering a legitimate, nondiscriminatory reason for terminating Davis—i.e., disruptive behavior in the workplace.

## B. Retaliation

[¶27.] Davis's second claim is that Wharf terminated her employment in retaliation for expressing her concerns at the May 7, 2013 meeting. Similar to a

---

4. After Davis volunteered that she was an "emotional wife," Manke made a comment later in the interview about Davis being an "emotional wife." This remark, however, was not asked in the form of a question but appeared to have been said as an acknowledgment of Davis's previous comments.

claim of gender discrimination, a claim of retaliation is also examined under the *McDonnell Douglas* burden shifting analysis. 411 U.S. at 802, 93 S. Ct. at 1824. The employee must first establish a prima facie case for retaliation. "To prevail on a claim of retaliation, [the plaintiff] must establish that she (1) engaged in a statutorily protected activity, (2) the employer took adverse action against her, and (3) there is a causal connection between the protected activity and adverse action." *Williams*, 2010 S.D. 19, ¶ 14, 779 N.W.2d at 402 (citing *Coleman-Santucci v. Sec., U.S. Dep't of Health & Human Servs.*, 754 F. Supp. 209, 216 (D.D.C. 1991)). Wharf concedes, for purposes of this appeal only, that Davis satisfied the three elements of a prima facie case of retaliation.

[¶28.] Because Davis has carried her burden of establishing a prima facie case of retaliation, the burden shifts to Wharf "to articulate some legitimate, nonretaliatory reason for the employment action." *Lord*, 2006 S.D. 70, ¶ 19, 720 N.W.2d at 450 (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1817). At this stage of the analysis, the defendant's burden is "only a burden of production, not persuasion." *Id.* (citing *Burdine*, 450 U.S. at 259-60, 101 S. Ct. at 1089, 1096). *See also Reeves*, 530 U.S. at 142, 120 S. Ct. at 2106 ("This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *St. Mary's Honor Ctr.*, 509 U.S. at 509, 113 S. Ct. at 2748)). "The defendant need not persuade the court, it must simply provide evidence sufficient to sustain a judgment in its favor." *Sloat v. Rapid City Area Sch. Dist. No. 51-4*, 393 F. Supp. 2d 922, 931 (D.S.D. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 958 (8th Cir. 1995)).

[¶29.] The Department determined that Wharf had a legitimate, nonretaliatory reason for terminating Davis. We agree. Wharf terminated Davis for disruptive behavior in the workplace.[5] Wharf detailed the extent of Davis's disruptive behavior in its written position statement. Davis did not dispute the facts contained in the position statement. Wharf stated that during the May 7, 2013 meeting, Davis was "overtly hostile and disrespectful at the meeting[,] using vulgar language and exhibiting irrational and disrespectful behavior." Davis made "disrespectful comments toward employees in supervisory or managerial positions and repeated allegations regarding corruption and mismanagement." Wharf further stated that Davis "went to various other employees expressing her dissatisfaction with Mr. Emery in an attempt to raise support for her belief that he should be fired[.]" She "complained to her coworkers regarding her dissatisfaction with upper management which created a divisive, unprofessional, and uncomfortable atmosphere for other employees." Davis did not dispute Wharf's reason for terminating her, i.e., that she disrupted the workplace by her conduct before, during, and after the May 7, 2013 meeting. Thus, in light of the evidence in the record that Davis caused disruption in the workplace, Wharf satisfied its burden

---

5. Both the circuit court and the Department concluded that Davis was fired for "insubordination." As a result, Davis argues in her briefs to this Court that she was not "insubordinate." However, the record reflects that Wharf fired her for "disruptive behavior in the workplace," not "insubordination." Disruptive behavior was the reason given in Wharf's position statement. Furthermore, the Department concluded in its investigative report that Davis "was discharged for disruptive behavior in the workplace." Thus, our analysis of this issue addresses "disruptive behavior" as the reason for termination rather than "insubordination."

of production in showing that it had a legitimate, nonretaliatory reason for terminating Davis. *See Lord*, 2006 S.D. 70, ¶ 19, 720 N.W.2d at 450.

[¶30.]    Because Wharf satisfied its burden of production in showing that it had a legitimate, nonretaliatory reason for terminating Davis, the burden shifts back to Davis to establish by a "preponderance of the evidence that the stated reason is merely a pretext for retaliation." *Id.* "[M]ore substantial evidence of [retaliation] is required to prove pretext, because evidence of pretext is viewed in the light of [the defendant's] legitimate, non-[retaliatory] explanation." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 992 (8th Cir. 2006). Davis cites to *Leslie v. Hy-Vee Foods, Inc.* in support of her argument that Wharf's decision to discharge her was pretextual. 2004 S.D. 59, 679 N.W.2d 785. In that case, Leslie reported the Hy-Vee store director for making numerous sexual comments in her presence. *Id.* ¶ 4, 679 N.W.2d at 787. Hy-Vee terminated Leslie because she was incompatible with the store director. *Id.* ¶ 6. On appeal, we reversed the circuit court's grant of summary judgment on Leslie's retaliatory discharge claim. *Id.* ¶ 22, 679 N.W.2d at 793. We held that Leslie established pretext because there was no evidence that Leslie and the store manager were incompatible prior to the store manager discovering Leslie's complaints. *Id.* ¶ 15, 679 N.W.2d at 790-91. Furthermore, Hy-Vee's reason for terminating Leslie was contradicted by the fact that she was an employee of Hy-Vee for 13 years, she received high evaluation scores, and she had no history of being an incompatible employee.

[¶31.]    The present case is distinguishable from *Leslie*. Here, based on the Department's investigation, Wharf established that disruptive behavior was the

reason it discharged Davis, which Davis did not dispute. This was not contradicted by the fact that Davis was a long-time employee of Wharf and received high evaluation scores. Indeed, Wharf acknowledged that Davis was a good employee; but, Davis's disruptive behavior crossed the line in May of 2013. Because Davis failed to dispute the reason for her termination, we conclude that Davis has not demonstrated by a preponderance of the evidence—i.e., more likely than not—that her termination was pretextual. *See Lord*, 2006 S.D. 70, ¶ 19, 720 N.W.2d at 450. The circuit court did not err in affirming the Department's finding of no probable cause.

[¶32.] **2. Whether the circuit court erred when it determined that Davis was terminated for permissible factors.**

[¶33.] Davis alleges that the circuit court erred when it determined that Davis was terminated for permissible factors. We disagree. To the extent that Wharf has already shown that it terminated Davis for a legitimate, nonretaliatory purpose, we conclude that the circuit court did not err when it determined that Davis was terminated for permissible factors.

[¶34.] **3. Whether the circuit court erred by affirming the findings of fact and conclusions of law submitted by the Department.**

[¶35.] Finally, Davis argues that we should reverse the circuit court decision because that court affirmed the Department's incorrect conclusion that "qualifications" is synonymous with "satisfactory performance" for purposes of determining whether Davis articulated a prima facie case of gender discrimination. Although the circuit court correctly "upheld the [Department's] decision for the wrong reason, we will not overturn a right result even though it is based on a wrong

reason." *See Seymour*, 419 N.W.2d at 209. Therefore, the circuit court did not err when it affirmed the Department's findings of fact and conclusions of law.

[¶36.]    We affirm.

[¶37.]    GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and KERN, Justices, concur.